IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN ARTHUR HAM,<br><br>                    Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,<br><br>                    Defendant. | 8:12-CV-209<br><br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff John Arthur Ham's disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. and 1381 *et seq*. The Court has considered the parties' filings and the administrative record, and affirms the Commissioner's decision to deny benefits.

### I. PROCEDURAL HISTORY

      Ham filed applications for disability insurance benefits and supplemental security income in March 2010, alleging disability beginning on September 30, 2009. T138-49. Ham's claims were denied initially and on reconsideration. T66-69; T74-79. Following a May 18, 2011 hearing, the administrative law judge (ALJ) found, in a decision dated June 9, 2011, that Ham was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382(a)(3)(A), and therefore not entitled to disability benefits. T24. The ALJ determined that, although Ham suffered from several severe impairments, and could no longer perform his past relevant work, he had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T14-24. The Appeals Council of the Social Security Administration considered additional evidence that had been submitted by Ham, but nonetheless denied Ham's request for review of the ALJ's decision. T4-7. Ham's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND
### 1. MEDICAL HISTORY

Ham's medical history is extensive: the record contains notes from Ham's primary care physician, George Hutfless, M.D., that go back as far as 1997. But for the most part, his complaints are consistent, and can be generally summarized. Ham was first diagnosed with exogenous obesity in 1997. T293. Ham's treatment records reflect an ongoing struggle with obesity, and hypertension has also been a chronic problem. *E.g.* T279-93. Hutfless diagnosed sleep apnea in 2005, and first diagnosed symptoms of depression in 2007. T282, T279. Ham also complained of joint pain, and arthritis was later observed. T284, T266-269, T295. By 2009, Ham was seeking bariatric surgery to address his obesity, which had progressed to morbidity. T266-69. Hutfless continued to treat Ham for various conditions, including obesity and depression. *E.g.* T295-98.

By 2010, Ham was seeing Hutfless regularly for chronic pain and arthritis, sleep apnea, depression, and obesity. T351-54. An MRI in 2010 suggested spondylolisthesis. T312. A consultation with a pulmonologist also suggested sleep apnea and hypoxemia. T330. Ham underwent gastric bypass surgery in May 2010. T334.

In connection with Ham's application for disability benefits, a psychological interview was performed in June 2010 by Jane Warren, Ph.D. T371. Ham told Warren he began taking an antidepressant (prescribed by Hutfless) about 3 years earlier, when his parents were having health problems. T375. Ham reported "that he has never been suicidal and has never experienced auditory or visual hallucinations." T375. Warren wrote:

> [Ham] states that his depression primarily takes the form of his negative attitude towards other people. He states that he feels like nobody cares about him and the whole world is often against him. He feels like bad things have always happened in his life and he prefers to be alone much of the time. [Ham] describes his depression as "just being down in the dumps most of the time." He states that the medication has been slightly helpful, but that the loss of both of his parents was significant and it has been difficult to not be able to work.

T375. Warren diagnosed Ham with major depressive disorder, single episode, mild. T377. She observed "[m]ild clinical depression symptoms in past 2-3 years." T372. Warren opined:

> [Ham] does not appear to have any restriction of activities of daily living or difficulties in maintaining social functioning. He endorses symptoms of mild clinical depression that he has experienced over the past two to three years. These symptoms appear to be related to the death of both of his parents and worsening physical health problems.
>
> [Ham] appears able to sustain concentration and attention needed for task completion. He appears able to understand and remember short and simple instructions and to carry them out. He appears able to relate appropriately to coworkers and supervisors and to adapt to change in his environment.

T377. Warren concluded: "The prognosis for this man appears to be positive. His antidepressant medication appears to keep his symptoms at a minimum." T377. Warren estimated that Ham's global assessment of functioning (GAF) was 60-70.[1]

In July 2010, Patricia Newman, Ph.D., performed a psychiatric review. T379. Newman found that Ham had a mood disorder secondary to morbid obesity that caused mild difficulties in maintaining concentration, persistence, or pace; but no restriction of activities of daily living or repeated episodes of decompensation.[2] T382; T389. Newman concluded: "[Ham] has history of treatment for his conditions. He has no history of hospitalizations. His symptoms appear to be mild with continued medication compliance. Considering the overall evidence the claimant's mental health condition is found to be non-severe." T391. A subsequent psychiatric review, conducted by Christopher Milne, Ph.D., reaffirmed Newman's findings. T415.

Jerry Reed, M.D., performed an assessment of Ham's physical residual functional capacity (RFC) in July 2010. T401. Reed found that Ham could

---

[1] A GAF is "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. See *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter, "DSM-IV-TR"). A GAF score of 51–60 indicates some mild symptoms; or some difficulty in social, occupational, or school functioning. A GAF score of 61 to 70 indicates some mild symptoms; or some difficulty in social, occupational, or school functioning; but that the subject is "generally functioning pretty well, [and] has some meaningful interpersonal relationships." DSM-IV-TR at 34.

[2] Newman failed to check any of the boxes on the psychiatric review technique form for whether Ham's condition produced difficulties in maintaining social functioning. T389. But it seems clear from the rest of the review that Newman did not find any significant limitations in that regard, or any other.

occasionally lift 20 pounds, frequently lift 10 pounds, and stand for at least 2 hours and sit about 6 hours in an 8-hour workday. T395. Ham could occasionally climb, balance, stoop, and kneel, but never crouch or crawl. T396. Reed estimated that Ham's condition would improve from bariatric surgery and that within 12 months of onset he should be capable of performing work activities within the residual functional capacity Reed had assessed. T401. Another physical RFC assessment was performed by A.R. Hohensee, M.D., which reaffirmed Reed's findings. T417.

Hutfless also completed an RFC form on April 7, 2011. On the form, Hutfless opined that Ham could occasionally lift or carry 10 pounds, but never more. T419. Hutfless indicated on the form that Ham could occasionally reach, but never bend, climb, squat, crawl, or reach above shoulder level. T419. In a separate letter, however, Hutfless opined that Ham could occasionally lift up to 10 pounds *or* 10-25 pounds, and could "possibly" carry up to 20 pounds occasionally, "but only for a short distance." T418. On the RFC form, Hutfless indicated that Ham could not sit, stand, or walk for more than an hour in each 8-hour workday. T419. In his separate opinion letter, Hutfless explained that while Ham spent most of the day sitting, he could not do so for prolonged periods without getting up and changing position. T418. Ham could not walk very far. T418. Hutfless said Ham's condition had been present for more than 12 months and could be expected to last at least 12 more months. T418.

Hutfless continued to treat Ham, observing arthritis, physical pain, and depression. T424-26; T438. Ham sought treatment for depression at Catholic Charities, and an initial diagnostic interview was conducted on April 13, 2011, by K.G. Langdon, PMHNP-BC. T428-35. At this interview, Ham reported new symptoms, including nightmares, paranoia, hallucinations, suicidal thoughts, and violent urges. T432-33. Langdon's initial diagnosis was major depressive disorder, single episode, severe without psychotic features. T434. Langdon also diagnosed a generalized anxiety disorder, specific phobias, and a personality disorder not otherwise specified. T434. Langdon estimated that Ham's GAF was 50.[3] T435. Langdon saw Ham twice more before the administrative hearing, and noted no progress in his condition. T440-41; T443-45.

### 2. HEARING TESTIMONY

Ham testified at the administrative hearing that he was unable to work because of problems with his back and legs: his legs would go numb and he

---

[3] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV-TR at 34.

had severe back pains. T29. Ham also said that he suffered from depression and severe headaches. T30. He used a CPAP machine for sleep apnea, but still woke up 2 or 3 times during the night due to back or leg pain, and was unable to go back to sleep for 30 to 45 minutes. T34-35. He said it was hard for him to sit because he constantly had to reposition himself. T35.

Ham explained that he could only sit comfortably for 2 to 3 minutes before having to stand up or move around. T35. But he could only stand for 5 minutes before his right leg went numb. T35. So, he could only walk, with a cane, for a block or two. T36-37. He could only be on his feet, he said, for 30 or 45 minutes a day. T37. But he also said he could only sit for about an hour a day. T37. Ham was asked what he did with the rest of his time, if he could only sit for an hour a day and could only be on his feet for about 45 minutes, and he said he "[t]r[ied] to do chores around the house" and spent about 3 or 4 hours a day lying down. T37.

Ham said his depression caused episodes of crying 2 or 3 times a day, and that 3 or 4 days a week he could not do anything because he was depressed. T39. He said that had been going on for 6 to 8 months.[4] T39. Before that, he said, he was depressed, but not as severely. T40. Ham said his depression had affected him at work, as he had broken down crying in the office. T40.

Ham said he did not think there was any job he could do, because he had trouble sitting and could not stand. T42. He also did not think he could alternate sitting and standing for 8 hours a day, 5 days a week, but he did not explain why. T42. Although he had lost 105 pounds since his surgery—down to 265 pounds at the time of the hearing—he said he felt worse than when he weighed 370 pounds. T28; T45.

The ALJ presented the vocational expert (VE) with a hypothetical based on a person who could lift up to 20 pounds on occasion and 10 pounds on a frequent basis; could stand for 2 hours and sit for 6 hours in an 8-hour day with normal breaks; had unlimited use of the extremities of the hands and arms but should not use his feet for pushing, although he could drive; and who should never crouch or crawl but could occasionally bend or stoop. T54. Such a person, the VE opined, could perform a full range of sedentary work. T55. But the VE said that if Ham's testimony was considered credible, he would not be able to perform competitive employment. T55-56.

---

[4] The administrative hearing was held on May 18, 2011. T25. Ham's alleged date of disability was nearly 30 months earlier: September 30, 2009. T138; T143.

### 3. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

#### (a) Step One

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Ham had not engaged in substantial gainful activity since his alleged disability onset date, and that finding is not disputed on appeal. T16.

#### (b) Steps Two and Three

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has "medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or

- 6 -

pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The first three criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id*.

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). 20 C.F.R. § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. 20 C.F.R. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

In this case, at step two, the ALJ found that Ham had some severe impairments: morbid obesity, multi-level degenerative disk disease of the lumbar spine, and obstructive sleep apnea. T16. The ALJ explained that while Ham had a mood disorder secondary to obesity, he did not have a severe, medically determinable mental impairment. T17. Regarding the paragraph B criteria, the ALJ found that Ham's mental impairment did not interfere more than minimally with his ability to perform basic work-related activities: he had no restriction of activities of daily living or difficulties in maintaining social functioning; only mild difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation. T17. Nor did he satisfy the paragraph C criteria: he had not had repeated episodes of decompensation of extended duration, would not decompensate with even a minimal increase in mental demands, and had not required a highly supportive living arrangement for at least 1 year.[5] T17.

---

[5] As relevant in this case, the paragraph C criteria would require a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support; and *either* repeated episodes of decompensation, each of extended duration; *or* a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; *or* a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.04C.

(c) Residual Functional Capacity

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by his impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. 34474-01, 34477 (July 2, 1996). An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. at 34477. The RFC must include all limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16, 1985 WL 56855, at *2 (1985)

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A

medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[6] and "other evidence."[7] 20 C.F.R. § 404.1529(c)(1) to (3).

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [his] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; 20 C.F.R. § 404.1529(d)(4). In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii).[8] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

Based on the credibility findings discussed above at steps two and three, the ALJ found that Ham had the RFC to perform sedentary work.[9] He could occasionally lift 20 pounds and frequently lift 10 pounds. He could stand for 2 hours out of 8 and sit for 6 hours out of 8, with normal breaks. He had the unlimited use of his arms and hands but was not to use his feet for

---

[6] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[7] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a)(1) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

[8] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524.

[9] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 416.967(a).

pushing, using pedals, or similar activities. He could drive. He was never to crouch or crawl but could occasionally bend and stoop. T17.

As is common in these cases, the ALJ found that Ham's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"; but that Ham's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC assessment. T18. The ALJ did not give great weight to Hutfless' assessment of Ham's capabilities because the RFC form he filled out was inconsistent with his accompanying opinion letter. T21. The ALJ found that Ham's "recent reports of auditory hallucinations and feelings that he is being watched appear exaggerated when viewed within the record as a whole." T21. The ALJ concluded:

> The claimant undoubtedly has impairments and limitations from pain; however, the record fails to establish these are as severe as alleged. The claimant's earnings record shows consistent, substantial earnings and reflects favorably on the credibility of his allegations, but even an outstanding earnings record cannot alone form the basis for a finding of disability, particularly when there are inconsistencies in the record as a whole.

T21. "Based on the total record," the ALJ found, "the claimant's symptoms and impairments are not as severe as alleged, and the undersigned has not given great weight to the claimant's implicit allegation that he is unable to engage in any and all kinds of full-time, competitive, gainful employment on a sustained basis." T21.

### (d) Steps Four and Five

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. *Gonzales,* 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do his past relevant work, he will be found to be not disabled; otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales,* 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

In this case, at step four, the ALJ found that Ham was unable to perform any past relevant work. T21. But the ALJ found, based on the testimony of the VE, that there were jobs that existed in significant numbers in the national economy that Ham could perform. T22. So, the ALJ concluded that Ham was not under a disability, and denied his claims for benefits. T24.

#### 4. REQUEST FOR APPEALS COUNCIL REVIEW

Ham filed a request for review of the ALJ's decision. T10. In support of that request, Ham submitted new evidence for consideration by the Appeals Council. T231-32.

##### (a) New Evidence

Langdon completed a psychiatric review form on which she diagnosed Ham with depressive syndrome characterized by anhedonia, sleep disturbance, decreased energy, difficulty concentrating or thinking, thoughts of suicide, and hallucinations. T453. Langdon opined that Ham's condition produced marked restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace. T454. Langdon also diagnosed an anxiety disorder resulting in motor tension, autonomic hyperactivity, and vigilance and scanning. T456. Langdon opined that as a result of all his mental disorders, Ham had marked restrictions of activities of daily living; extreme difficulties in maintaining social functioning; and often suffered deficiencies of concentration, persistence, or pace; and three or more episodes of decompensation in work or work-like settings. T461-63.

Langdon also authored a letter[10] in which she opined that Ham had, among other things, a major depressive disorder and a generalized anxiety disorder. T467. Langdon opined that Ham's anxiety and depression were worsening his physical pain, and his physical pain was aggravating his depression and anxiety. T468. Langdon reported that Ham reported being unable to vacuum, load and unload the dishwasher, do yard work, laundry, clean the bathrooms, or do heavy grocery shopping. T468. She said he had "to push himself to do the limited amount of light housework he is capable of as his depression is so severe and he does not have sufficient energy, motivation and ability to clean it even though he wants to have a clean house." T468-69. Langdon opined that as a result, Ham was "likely to experience extended episodes of deterioration which would cause him to withdraw from work or a work-like setting." T469. Langdon concluded that Ham would be unable to participate in gainful employment for at least a year. T469.

Ham had also seen Hutfless again; Hutfless noted arthritis, back pain, sleep apnea, hypertension, exogenous obesity, depression, and ongoing results of Ham's gastric bypass surgery. T470. Hutfless opined that Ham was

---

[10] Both the psychiatric review form and the opinion letter were co-signed by Michael Meyer, M.D., as a "collaborative psychiatrist." But there is no indication in the record that Meyer ever treated or saw Ham. As a result, there is no basis for considering Meyer to be a treating medical source, and the Court does not view his signature on these documents as adding anything significant to the credibility of Langdon's opinions.

"unable to be gainfully employed." T470. Ham was also seen by Joseph A. Wenzl, M.D., for an initial evaluation of chronic pain; Wenzl's assessment was chronic pain syndrome. T471-74.

### (b) Appeals Council Determination

The Appeals Council said that in looking at Ham's case, it had considered the additional evidence submitted by Ham. T4; T7. But, the Appeals Council found no reason to review the ALJ's decision, and denied Ham's request for review. T4.

### III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole, including the new evidence that was considered by the Appeals Council. *See, Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)); *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013); *see also Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Teague*, 638 F.3d at 614. When the Appeals Council denies review of an ALJ's decision after reviewing new evidence, the Court does not evaluate the Appeals Council's decision to deny review, but rather determines whether the record as a whole, including the new evidence, supports the ALJ's determination. *McDade*, 720 F.3d at 1000; *Perks*, 687 F.3d at 1093; *see also, Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*. The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

IV. ANALYSIS

Ham argues generally that the Commissioner's decision to deny benefits is neither supported by substantial evidence nor consistent with legal and regulatory standards. In particular, Ham argues that the ALJ erred by not classifying Ham's mental impairments as severe, the Appeals Council failed to consider his supplemental evidence, the ALJ improperly evaluated Ham's subjective complaints of pain and depression, and the ALJ failed to appropriately account for all of his impairments in determining his RFC.

### 1. FAILURE TO EVALUATE ALL SEVERE IMPAIRMENTS

Ham's first argument is that the ALJ erred by finding that his mental impairments were not severe. Filing 16 at 11. This argument is directed at the ALJ's determination, at step two, that Ham had a mood disorder but that it was not a severe impairment. T17. Ham points to the evidence that he had been diagnosed with and treated for depression by Hutfless, his primary care physician. And Ham relies on his initial evaluation by Langdon at Catholic Charities. Ham argues that

> [w]hile the ALJ recognized Ham's treatment at Catholic Charities, he discounted it because if [sic] was of short duration at the time of the hearing. At no time did the ALJ recognize and possibly correlate Ham's prior treatment by his primary care physician with prescription medications and consider that the depression spanned the relevant time period in this case. It is as if Ham suddenly woke up one day with the severe impairments as set forth in the Catholic Charities evaluation.

Filing 16 at 12.

But from the record, it *does* appear as if Ham "suddenly woke up one day" with the symptoms he reported to Langdon at Catholic Charities. This is, in fact, support for the ALJ's finding: the ALJ did not find Ham's reports to Langdon credible because they were not consistent with the record as a whole. T21. Ham reported symptoms to Langdon, such as hallucinations and paranoia, that do not appear in any of Hutfless' notes, and there is no reason to believe that Hutfless would not have noted them (and taken them seriously) had Ham reported them. Ham denied hallucinations or suicidal thoughts in his interview with Warren. In sum, there is substantial evidence in the record to support the ALJ's determination that Ham's complaints to Langdon were not wholly credible.

Instead, the ALJ relied on the state agency consultants, Newman and Milne, who had reviewed Ham's treatment history and Warren's consultative

examination of Ham. T20. Each opined that Ham's condition was not severe. T377; T391; T415. This is substantial evidence supporting the ALJ's finding to the same effect.[11]

### 2. NEW EVIDENCE TO APPEALS COUNCIL

Ham contends that the Appeals Council "did nothing" with the evidence that was submitted after the ALJ's decision. Filing 16 at 14. He correctly notes that pursuant to 20 C.F.R. § 404.970(b), if new and material evidence is submitted, the Appeals Council shall consider the additional evidence if it relates to the period on or before the date of the ALJ's decision, shall evaluate the entire record including the new and material evidence, and then review the case if it finds that the ALJ's decision is contrary to the weight of evidence in the supplemented record. Ham asserts that "[t]here is nothing in the decision of the Appeals Council which indicates that the above regulation was followed." Filing 16 at 14.

But there is. The Appeals Council stated that it had "considered the reasons [Ham] disagree[d] with the decision and the additional evidence listed on the enclosed Order of Appeals Council." T4. And the Order of Appeals Council itself stated that it had received Ham's additional evidence, consisting of Ham's brief and exhibits 28F and 29F, which contained the new evidence summarized above.[12] T7. This was sufficient to show compliance with 20 C.F.R. § 404.970(b).

That having been said, the Court notes that the Appeals Council decision simply states that the new evidence was "considered" but that it did not "provide a basis for changing" the ALJ's decision. T4-5. This is a

---

[11] As will be discussed below, there is some question about whether the additional evidence submitted to the Appeals Council was actually weighed by the Appeals Council, such that the Court should consider it now when reviewing the record for substantial evidence. But for reasons that will become apparent, the Court finds that even if the new evidence submitted to the Appeals Council is included, the record contains substantial evidence supporting the ALJ's decision.

[12] For the sake of completeness, the Court notes that the order expressly described exhibit 28F as containing medical records "dated July 5, 2011 and July 19, 2011" but, among other things, described Hutfless as an "unknown source" and failed to note Langdon's separately dated June 30 psychiatric review form. The Court is troubled by that: in particular, it is hard to believe that given the prominence of Hutfless' progress notes in the record, someone could meaningfully review the evidence yet describe Hutfless as an "unknown source." That kind of sloppiness does not speak well of the Social Security Administration. But the Court cannot conclude that the Appeals Council did not mean what it said when it said it had considered exhibit 28F. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). And Hutfless' progress note said nothing remarkable, nor does the Court find (as explained below) that Langdon's opinions provide a basis to reverse the ALJ's decision.

particularly unhelpful bit of Social Security boilerplate: as the Seventh Circuit has noted, "[o]n the one hand, it might indicate that the Appeals Council found the proffered new evidence to be immaterial, but on the other hand it might indicate that the Council accepted the evidence as material but found it insufficient to require a different result." *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). The Court urges the Commissioner to strive for more clarity on this point. For now, from an excess of caution, the Court will interpret the Appeals Council decision as stating that it had rejected the evidence as non-qualifying under the regulation. *See id.*; *see also Aulston v. Astrue*, 277 Fed. Appx. 663, 664 (8th Cir. 2008).

But the Court finds no error in the Appeals Council's (implicit) determination that the proffered evidence was not new or material. To be "new," evidence must be more than merely cumulative of other evidence in the record. *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008). And evidence is "material" if it is relevant to the claimant's condition for the time period for which benefits were denied. *Id.* To be material, there must also be a reasonable likelihood that consideration of the evidence would have changed the Commissioner's determination. *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011); *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003); *see also Padgett v. Shalala*, 9 F.3d 114, at *2 (8th Cir. 1993) (unpublished table decision); *cf. Krogmeier v. Barnhart*, 294 F.3d 1019, 1025. (8th Cir. 2002) (applying same standard to new evidence received for first time by court under 42 U.S.C. § 405(g)). Whether evidence meets these criteria is a question of law the Court reviews de novo. *Bergmann*, 207 F.3d at 1069.

Neither Hutfless' additional progress note nor Wenzl's assessment of chronic pain syndrome were "new" evidence: both were cumulative of diagnoses that were already present in the record. Langdon's opinions may have been new, but they were not "material": Langdon was not a "treating source" whose opinion was entitled to controlling weight. Even if the two appointments Langdon had with Ham could be said to establish an ongoing treatment relationship, a nurse practitioner is not one of the acceptable medical sources listed in the regulations. *See*, 20 C.F.R. §§ 404.1502, 404.1513(a), and 404.1527(c)(2). And Langdon's opinions were based on Ham's self-reported symptoms, which the ALJ found to be overstated when compared with Ham's medical records. Nothing in Langdon's documentation made Ham's symptoms more persuasive or consistent with the rest of the record. Therefore, even if the Appeals Council did reject the evidence, the Court finds no reasonable likelihood that it would have changed the Commissioner's determination. Simply put, the ALJ's decision was based on credibility determinations that are unaffected by the additional evidence.

### 3. EVALUATION OF SUBJECTIVE COMPLAINTS

Ham contends that the ALJ improperly evaluated his testimony regarding his subjective complaints of pain and depression. As previously noted, in assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524. Ham contends that the ALJ failed to properly consider all these factors.

Having reviewed the ALJ's decision, however, the Court is satisfied that the ALJ applied the appropriate standard when weighing Ham's credibility. Although the ALJ did not enumerate each factor and explain it separately, each of the factors listed was discussed in the ALJ's comprehensive discussion of Ham's medical history. T18-21. And the ALJ did not wholly discredit Ham's testimony—he simply found that Ham's limitations were not quite as severe as alleged. That conclusion is supported by the evidence. The Court has already noted, as did the ALJ, that the symptoms of mental illness Ham reported to Langdon were not consistent with what had previously been reported to Hutfless and denied to Warren. And Ham's testimony at the administrative hearing was somewhat difficult to sort out: Ham seems to have testified that he could stand up for no more than 45 minutes a day, could only sit for an hour a day, and spent 3 or 4 hours a day lying down. That simply does not add up. In short, while there is no real question that Ham suffers from some physical impairments, there was sufficient reason for the ALJ to question whether Ham is as limited as he claimed to be.

As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is. *Perkins,* 648 F.3d at 901. While the ALJ may not discount subjective complaints solely because they are not supported by objective medical evidence, the absence of such evidence *is* relevant to a claimant's credibility. *See, Halverson v. Astrue,* 600 F.3d 922, 931-32 (8th Cir. 2010); *Hamilton v. Astrue,* 518 F.3d 607, 612-13 (8th Cir. 2008). Here, the ALJ adequately addressed Ham's credibility and found that he was mostly but not entirely credible about his own limitations. The Court defers to that conclusion. *See Boettcher,* 652 F.3d at 863.

Ham also contends, in passing, that the ALJ erred by discounting a report from Ham's sister, who described his physical limitations and depression. The ALJ explained that

> [o]ut of natural concern and devotion, it is not uncommon for friends and family members to place unreasonable limitations on the daily activities of a loved one, or to attribute even ordinary changes in mood to an impairment, whenever illness or injury occurs. Clearly [Ham's sister] is genuinely concerned about the claimant's well-being; however, her implicit allegation that the claimant is disabled is subject to the considerations noted above regarding the claimant's own testimony.

¶21. Ham argues that if reports from family or friends can be "summarily discounted" on those grounds, then "there is no reason to obtain the information in the first place." Filing 16 at 19.

A failure to make credibility determinations concerning such evidence, and to reject it without specifically discussing it, could require a reversal. *See, Willcockson v. Astrue*, 540 F.3d 878, 880-81 (8th Cir. 2008); *Smith v. Heckler*, 735 F.2d 312, 317 (8th Cir. 1984). But in evaluating the statements of a claimant's family member, it is entirely acceptable to consider whether those statements are motivated by affection for the claimant. *See Perkins*, 648 F.3d at 901; *cf., Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993); *Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988). The ALJ, having properly found Ham's complaints not fully credible, was equally empowered to reject the cumulative testimony of his sister. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001); *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998); *see also Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996).

### 4. DETERMINATION OF RFC

Finally, Ham contends that the ALJ failed to appropriately account for all of Ham's impairments in determining his RFC. Thus, Ham argues, the hypothetical question posed to the VE was deficient. *See Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (hypothetical question must precisely describe claimant's impairments so that VE may accurately assess whether jobs exist for claimant). But a hypothetical must include only those impairments and limitations that are supported by the record, which the ALJ accepts as valid, and which the ALJ finds to be credible. *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010); *Young*, 221 F.3d at 1069. Ham's argument is really that the ALJ should have based Ham's limitations on the evidence that the ALJ, as discussed above, did not find credible. The Court has already rejected the basis of that argument.

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Ham. The Court therefore concludes that the Commissioner's decision was supported by substantial evidence and should be affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed.

2. Ham's complaint is dismissed.

3. The parties shall bear their own costs.

4. A separate judgment will be entered.

Dated this 27th day of September, 2013.

BY THE COURT:

_____
John M. Gerrard
United States District Judge